**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **TINA MCLINTOCK.** | : | |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | **Civ. No. 20-507** |
| | : | |
| **CITY OF PHILADELPHIA** | : | |
| **et al.,** | : | |
| **Defendants.** | : | |

---

**Diamond, J.**          **MEMORANDUM**          **December 3, 2020**

Municipal employee Tina McLintock, a Caucasian woman, alleges that her supervisor David Jones and the City of Philadelphia discriminated against her because of race.  Plaintiff's accusations generate more heat than light and have no record support.  Accordingly, I will grant Summary Judgment in Defendants' favor.

## I.          JURISDICTION

Plaintiff brings this action pursuant to the Pennsylvania Human Relations Act, the Philadelphia Fair Practices Ordinance, the First Amendment, 42 U.S.C. § 1981, and Title VII.  See 43 Pa. Stat. Ann. § 951 et seq.; Phila. Code. § 9-1101, et seq.  The Court has jurisdiction to hear Plaintiff's federal claims under 28 U.S.C. § 1331 and supplemental jurisdiction to hear Plaintiff's state law claims under 28 U.S.C. § 1367.

## II.          LEGAL STANDARDS

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The moving party must initially show the absence of any genuine issue of material fact.  See Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  An issue is "genuine" if there is evidence on which a reasonable fact finder could return a verdict for the nonmoving party.  Kaucher v. Cty.

of Bucks, 455 F.3d 418, 423 (3d Cir. 2006) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)).  A factual dispute is "material" if it might affect the case's outcome under governing law.  Id. (citing Anderson, 477 U.S. at 248).  I must view the facts and draw all reasonable inferences in the opposing party's favor, although "[u]nsupported assertions, conclusory allegations, or mere suspicions are insufficient to overcome a motion for summary judgment." Betts v. New Castle Youth Dev. Ctr., 621 F.3d 249, 252 (3d Cir. 2010); see Anderson 477 U.S. at 255.

If the moving party satisfies its burden, the opposing party must then show a disputed material factual issue.  It is not enough simply to reiterate factual allegations or "show some metaphysical doubt as to the material facts."  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  Rather, the nonmoving party must establish a triable issue by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials," or by "showing that the materials cited do not establish the absence or presence of a genuine dispute."  Fed. R. Civ. P. 56(c).

Finally, summary judgment is appropriate if the responding party fails to make a factual showing "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  Celotex, 477 U.S. at 322.

## III.   CAUSES OF ACTION

Plaintiff presently works in the City's Department of Behavioral Health and Intellectual Disability Services.  The gravamen of Plaintiff's instant Second Amended Complaint is that the failure to appoint her the Department's Chief Financial Officer apparently was the result of an agreement among various officials, acting under the guise of the City's diversity hiring program,

to favor Black candidates and disfavor Caucasian candidates.  (Pl. Opp'n Br. 10, 15.)  Plaintiff brings three claims against both Defendants: (1) the failure to promote her was racial discrimination; (2) this failure was also retaliation for Plaintiff's opposition to the racism displayed by Black employees; and (3) Plaintiff was subjected to a hostile work environment as retaliation for filing an EEOC charge and the current lawsuit—all in violation of 42 U.S.C. § 1981 (Count I), Title VII (Counts II/IV), the PHRA (Count IV), the PFPO (Count V), and the First Amendment (Count III).  (Pl. Opp'n Br. 3.)  Although Plaintiff makes little effort to distinguish the claims and even less effort to address their distinctive elements, I will do so here

## IV.    FACTS

Relying on the Parties' statements of undisputed material facts as well as deposition transcripts, discovery responses, exhibits, and other record documents, I have resolved factual disputes and construed the record in Plaintiff's favor.  <u>Hugh v. Butler Cty. Family YMCA</u>, 418 F.3d 265, 267 (3d Cir. 2005).

### A.  Employment and Organizational Background

Plaintiff has been a Philadelphia municipal employee for over 32 years.  (Doc. 21, Ex. A, McLintock Dep. 12:14-19.)  She holds a Bachelor's degree in Political Science and a Master's in Public Administration.  (<u>Id</u>. at 11:22-12:8.)  She is not an accountant, nor has she studied accounting.  (<u>Id</u>. at 44:1-21) (". . . I cannot say that I've specifically taken accounting classes.") She has worked in the District Attorney's Office, the Finance Department, and other agencies as a clerk typist and in other positions.  (Pl's SUMF ¶ 3.)  She has worked in DBHIDS since 2013, initially as a "fiscal officer," before being promoted to Fiscal Director in February, 2017.  (<u>Id</u>. at 12:14-15:10; Doc. 21, Ex. B, Jones Dep. 15: 3-15.)  As a fiscal officer, Plaintiff had six direct reports, but at present she supervises only five Department employees.  (McLintock Dep. 16:7-16;

108:4-17.)  Before seeking to become CFO, she unsuccessfully sought to become DBHIDS Deputy Commissioner.  (Id. 153:24-154:14.)

Plaintiff reported directly to the Department's Chief Financial Officer, James Hoefler—a Caucasian man—until he retired in January 2020.  (Doc. 21, Ex. C, Hoefler Dep. 10:5-12:5; 105:9-10.)  In June 2019, Joseph Lowry, an African American man, began serving as CFO alongside Hoefler in a transition that continued until Hoefler retired. (Doc. 21, Ex. E, Lowry Dep. 56: 2-15; Jones Dep. 132:20-133:7; Pl's SUMF ¶ 28.)  The CFO reports to both the Department's Commissioner and Deputy Commissioner.  (Jones Dep. 14:7-12.)

Defendant David Jones, an African American man, is the Department's current Commissioner.  (Jones Dep. 20: 1-5; Def's SUMF ¶ 9.)  Provisionally designated in February 2017, Jones was permanently appointed Commissioner in July 2017.  (Id. at 10:13-20.)  Since January 2018, the Deputy Commissioner has been Jill Bowen, PhD, a Caucasian woman.  (Doc. 21, Ex. D, Bowen Dep 17:6-11; Pl's SUMF ¶ 3 n.3.)

## B.  Plaintiff's Employment Difficulties

Jones supervises 291 budgeted employees and has "additional oversight for community behavioral health"—totaling 1000 people.  (Jones Dep. 25:20-26:2; 47:13-21.) (Jones Dep. 25:20-26:2; 47:13-21.)  He has very little direct contact with Plaintiff.  (Id.)  Between late 2015 and early 2016, however, Jones and Plaintiff discussed Hoefler's announced retirement.  (McLintock Dep. 20:3-8; Def. SUMF ¶ 13, n.1.)  In her deposition and in her first EEOC complaint, Plaintiff stated that Jones told her that she was "next up" in the "natural progression."  (Id. at 21:15-21; 24:16-24.)  Jones told Plaintiff that she ought to "shadow" Hoefler.  (Def's SUMF ¶ 14-16; Pl's SUMF ¶ 11-14.)  Jones testified that this was in accordance with past practice when the Department's CFO leaves:

4

. . . whomever [sic] comes in next, it's good for that person to have information so that they can be able to share it with -- whether they move into a role or CFO or not, it's information that's critical for the department to have.

So when [Plaintiff] came in, it was from—candidly, from that conversation [with another staff member about past Departmental practice] that I thought—so it will be good to have [Plaintiff] shadow Mr. Hoefler to get information; that way she can share it. We would be able to retain the information and she would be in a place to be able to share it or sustain it either way.

(Jones Dep. 137:1-13.)  The record shows Plaintiff alone believed that Jones directing her to shadow Hoefler meant that he had decided to promote her.

The 'shadowing' process lasted from 2015 until November 2018.  (Id.)  Although Hoefler thus made the "assumption" that Plaintiff was "next in line" and qualified for his job, he never suggested to Bowen, Jones, or Plaintiff that she should or would replace him.  (Hoefler Dep. 22:15-25:6; 20:8-23.)

Uncontradicted evidence shows that after her last formal evaluation, Plaintiff became a problematic employee.  Jones, Bowen, and Hoefler described Plaintiff's difficulty working with others:

[Jones]: [T]hey were really challenged by Tina's interpersonal skills, really her lack of flexibility that she would at times only see one right way of doing it and it was hers, and that while everyone was invested in getting to the right outcome, of course, it was -- it was the unwillingness and unrelentingness of it being only Tina's way that created a lot of challenges.

(Jones Dep. 20:16-24; Bowen Dep. 65:0-66:5; Hoefler Dep. 37:24-41:3; Doc. No. 20, Ex. F, Vasko Declaration ℙ 8.)  Her supervisory skills were lacking.  (Bowen Dep. 68:5-11; Doc. No. 20, Ex. F, Vasko Declaration ℙ 7.)  ("[Bowen]: She was having difficulty with some of the people that reported to her.")  ("[Vasko]: Through observation of Tina McLintock in meetings . . . it is my opinion that her management style and way of communication, does not lend well to groups . . . that have to work as a team.")  In addition to provoking various staff complaints, Plaintiff's surly manner caused at least one employee to tender her resignation.  (Jones Dep. 23:7-16; 25:1-3.)

("[The employee] felt like she needed to leave the department in order to get away from the harassment she was experiencing.")  Plaintiff was aware of these criticisms.  (Hoefler Dep. 30:4-18.)  Indeed, Hoefler and Bowen counseled Plaintiff respecting her deficient "interpersonal skills." (McLintock Dep 119:16-20.)

In Spring 2016, Jones created the Operations/Fiscal Unit to train analysts in both programming and finance.  (Def's SUMF ¶ 23; Hoefler Dep. 33:13-34:24.)  The Unit experienced significant organizational difficulties: duties and work structures were poorly understood.  (Pl. SUMF ¶ 92; Def. SUMF ¶ 26.)  This in turn caused friction between Fiscal Department employees—whom Plaintiff supervised—and Ops/Fisc employees.  (Id.)  Trying to reduce the friction, Bowen attended joint meetings with both Units.  (Def's SUMF ¶33-35.)

Plaintiff initially attributed these difficulties to Ops/Fisc's lack of structure.  (McLintock Dep. 56:6-58:16.)  Beginning in August 2017, however, Plaintiff repeatedly asked about the availability of "cultural/gender awareness training," which she believed would reduce tensions. (Id. at 68:10-14; Doc. 21, Ex. H.)  In March 2018, Plaintiff concluded that Ops/Fisc's problems were "racially motivated."  (McLintock Dep. 57:1-58:16.)  She opined that the "almost entirely African-American" Ops/Fisc staff—in contrast to the racially diverse Fiscal staff—engaged in "ganging up behaviors" and "wanted to fight about everything."  (Id. at 57:1-17, 58:17-23; 59:1-6, 60:16-23.) ("[McLintock:] If this one objected to something, they all jumped on board.")

Plaintiff reported her conclusions to Dr. Bowen in March 2018, having shared her 'ganging-up' analysis with Jones.  (Id. at 58:9-16; 60:20-23.)  Plaintiff was "very vocal" in expressing her belief that the Black Ops/Fisc staff was creating racial tensions, bringing it up at another meeting in December 2018.  (Pl. SUMF ¶ 97; Def. SUMF ¶ 47.)  Plaintiff concluded that Jones and Bowen were treating Ops/Fisc staff better than Plaintiff's Fiscal Department staff

6

because Ops/Fisc's staff was mostly African American.  (McLintock Dep. 71:2-7, 73:5-20.)

Although Bowen noted a "palpable tension" between Plaintiff and the Ops/Fisc employees, Plaintiff alone attributed this problem to race.  (Bowen Dep. 69:2-70:6; 70:7-71:2; 73:1-6.) (Bowen: "I felt that what was driving the tension had to do with the way in which the [Ops/Fisc] unit had been created.")  Jones believed that tensions between Plaintiff and other Department employees arose from Plaintiff's deficient "interpersonal skills," "lack of flexibility," and insistence that tasks must be performed "[her] way."  (Jones Dep. 20:4-24.)  Bowen discussed these concerns with Plaintiff.  (Bowen Dep. 65:9-66:16.)

Plaintiff's last formal evaluation took place on September 1, 2015—over a year before she was made the Department's Fiscal Director.  Plaintiff received a rating of  "Outstanding" in every performance category except "Communication," which was "Superior."  (Doc. No. 22, Ex. RR at 1.)  Hoefler made these ratings, and Jones approved them after reviewing Hoefler's evaluation. (Id.; Jones Dep. 64:16-20.)  Plaintiff was not again formally evaluated after her February 2017 promotion to Fiscal Director.  She never received any formal discipline or written warning as a result of her apparent inability to supervise or work with others, a problem that became apparent in August 2017 (two years after her last evaluation).

## C.  Hiring a New CFO

In August 2018, Plaintiff was distressed when she learned that George Hanson (who is African American) was being interviewed for the CFO position.  Two months later, however, the City selected Hanson to head Human Resources—the Department's "Chief People Officer." (McLintock Dep. 27:1-11; Pl. SUMF ¶ 19.)  Plaintiff believes that Hanson was qualified for the CFO position, but not qualified to head HR.  (Pl. SUMF ¶ 17-19.)  The record is unclear as to whether Hanson was actually considered for CFO.  (Hanson Dep. 13:23-14:4; Bowen Dep. 30:2-

21.) Jones—the decisionmaker for the CFO position—denies even informally considering Hanson. (Jones Dep. 69:7-70:20; 126:13-21.)

After learning in August that Hanson might have been interviewed for CFO, Plaintiff told Bowen that she had been assured by Jones that after Hoefler's retirement, she would be named CFO. (McLintock Dep. 29:17-30:11.) Bowen said that she would speak to Jones about the CFO position. (Id. at 29:12-15.) In November, Jones and Bowen told Plaintiff that she might not be appointed CFO, but that she would be considered for another position. (Id.) Remarkably, Plaintiff did not ask Jones or Bowen why she might not be appointed CFO, nor did she ask what "they were looking for in the next CFO." (McLintock Dep. 33:22-34:1; 38:21-39:2.) Significantly, Plaintiff still intended to apply for the CFO position, and was not discouraged from doing so. (Def. SUMF ¶ 58.) To the contrary, Jones and Bowen testified that had Plaintiff applied for the position, she would have received fair consideration. (Jones Dep. 68:16-69:4, 157-158; Bowen Dep. 63: 1-5; 113-114.)

As his employment with the City shows, although Hoefler is not a CPA, he is (unlike Plaintiff) an experienced accountant. (Hoefler Dep. 10:18-12:1.) In selecting his replacement, the Department decided in early 2019 that its Chief Financial Officer should be a Certified Public Accountant. (Id. at 80:22-81:4.) The Department did not publicly post the CFO vacancy, and instead used an executive search firm, as it did when it hired Jones and Bowen. (Jones Dep. 9:21-23, 81:16-18; Bowen Dep. 17:6-19:4.) Although Plaintiff alleges this was sinister, the process was "very typical" for the Department. (Bowen Dep. 17:6-19:4.) The firm was instructed to focus on candidates with "prior experience in healthcare and/or government experience with an understanding of Medicaid and grants," as Jones anticipated an increase in managed health care plan enrollment. (Def. SUMF ¶ 63; Jones Dep. 112:12-113:5.)

8

Plaintiff testified that she never applied for the CFO position because the opening was not publicly posted.  (McLintock Dep. 35:2-10.)  She never suggested that she failed to apply because she was not an accountant.  To the contrary, she testified that had she known of the posting, she would have applied.  (Id.)  Yet, Plaintiff obviously knew of the opening.  Moreover, Jones explained that "by word of mouth" he and others let Department staff and "other City employees across various departments" know "we were looking a CFO" because Hoefler was retiring.  (Jones Dep. 153:18-21.)  As Bowen testified, "It was well understood, because [Hoefler] was someone who had been there for many, many decades, people were aware that he was retiring."  (Bowen Dep. 58:4-9.)  Plaintiff made no effort, however, to determine the process by which the position would be filled or if she could apply "internally."  (McLintock Dep. 35:11-37:4.)

To interview those who had applied, Jones and Bowen created a panel on which Hoefler served.  (Bowen Dep. 78:12-23.; Pl. SUMF ¶ 41.)  The panel was instructed to seek candidates with managed care experience and recommend the top two 'finalists' to Jones, who would make the hiring decision.  (Id. at 109:3-111:16.)

From March through May 2019, the panel interviewed four CFO candidates; Plaintiff was not among them because she had not applied for the position.  In December 2018 and January 2019 (before the panel interviews began), Lowry and Hanson spoke about the CFO opening, leading Lowry to send his resume to Hanson, who forwarded it to Bowen with his recommendation.  (Lowry Dep. 23:19-24:19; Pl. SUMF ¶ 40.)  Lowry interviewed with the panel on March 27, 2019.  The panel recommended Mitchell Appleson (a Caucasian man) and Lowry.  (Def. SUMF ¶ 69; Hoefler Dep. 84:14-18.)  Lowry spoke with Jones by phone on May 2, 2019, and sat for interviews with Jones and Hoefler on May 15, 2019.  (Pl. Ex. FF.)  Appleson's final interview with Jones took place on May 22, 2019.  (Jones Dep. 127:3-16.)  Bowen testified without contradiction that

the panel "thought together that [Lowry] was the best candidate." (Bowen Dep. 103: 4-21.)

After the interviews concluded, Jones offered the CFO position to Lowry, who accepted. (Id.)  Until Plaintiff learned that Lowry was African American, she did not think that she had been "passed over" because she is Caucasian.  (McLintock Dep. 54:8-18.)  Plaintiff testified that Hoefler told her that Lowry was "the only African American they could get in for an interview."  This "led [Plaintiff] to believe that [Hoefler] either knew or suspected that the hiring was to be of a black or minority person."  (McLintock Dep. 39:2-6.)  Significantly, however, Plaintiff acknowledged that she had no "firsthand knowledge" or "conversations with anyone that the department or Commissioner Jones was not seeking to hire [Plaintiff] because [she is] Caucasian."  (Id. at 142:3-7.)  Hoefler denies ever discussing the race of the candidates with Plaintiff and believes that her race played no role in Lowry's selection.  (McLintock Dep. 39:2-6; Hoefler Dep. 68:4-24.)  This was confirmed by Bowen.  (Bowen Dep. 96:23-98:24.)

### D.  Subsequent Events

Lowry's appointment was announced on June 11, 2019.  Two days later, Plaintiff filed a discrimination charge with the EEOC. (Pl. SUMF ¶ 56.)  On December 11, 2019, the EEOC issued to Plaintiff a right to sue letter.  (Doc. No. 22 Ex. MM.) Plaintiff alleges that a short time later, Defendants took the following actions that led her to file a retaliation charge with the EEOC:

- On August 19, 2019, in the presence of other staff, Lowry blamed Plaintiff for various budget errors, noting that she was not an accountant.  (McLintock Dep. 75:6-76:23, 78:12-22.)

- In the Fall of 2019, Lowry cancelled several "one-on-one" meetings with Plaintiff and began scheduling meetings directly with her subordinates.  (Id. at 82:14-23; Pl. SUMF ¶ 66.)  At one such meeting, Lowry asked Plaintiff's subordinate if he "got along with"

Plaintiff.  (Pl. SUMF ¶ 65.)  Only after Plaintiff complained to Lowry did he begin inviting

her to his meetings with subordinate staff and reinstating the one-on-one meetings.  (Lowry

Dep. 59:19-60:16; Pl. SUMF ¶ 67-9.)

- In January 2020, Lowry and Bowen held meetings related to a project on which Plaintiff
  was the manager, but did not invite her. (Pl. SUMF ¶ 70.)

- Lowry moved contracts supervisor Pat Wright from Plaintiff's supervision to Lowry's
  "command team."  (Id. at 108:15-109:13.)

- Plaintiff was provided a link to attend a virtual budget meeting—to discuss a budget she
  herself had prepared—only at the last minute.  (Pl. SUMF ¶ 76.)

- Bowen engaged in similar behavior, "excluding me from meetings, asking other people
  about the work I do…."  (McLintock Dep. 95:7-15.)

Together, these incidents led Plaintiff to conclude that she was being "shov[ed] [] out of

the way" at DBHIDS, where she still serves as Fiscal Director.  (Id.)

## V.      DISCUSSION

Plaintiff alleges primarily that after Jones told her (years before he even knew who might

apply for the position), that Plaintiff would likely become CFO and groomed her for the position,

he decided not to appoint her because she is Caucasian.  First, because Plaintiff never actually

applied for the position, she suffered no "adverse employment action" and so cannot make out a

*prima facie* case of discrimination.  In any event, her primary contention has no record support,

and contradicts itself: if Jones refused to promote Plaintiff because she is Caucasian, why would

he purportedly have said that he was going to promote her?  Plaintiff further alleges that her "work

environment has been hostile in the sense that . . . there has been extensive and pervasive favoritism

towards black employees . . . [who] conduct themselves inappropriately," and that Plaintiff has

11

thus "been forced to tolerate mistreatment."  (Pl. SUMF ¶ 90.)  Once again, these ugly accusations

have no record support.  Finally, Plaintiff claims that she suffered impermissible retaliation

because she made these complaints about the Ops/Fisc staff—in her view, protected conduct.

Because her complaints have no evidentiary support, they were not "protected."

### A. Race Discrimination

Plaintiff charges that Defendants' failed to promote her because she is Caucasian.  See 42

U.S.C. § 1981; Title VII.  Plaintiff proceeds under both pretext and mixed motive theories.  See

McDonnell Douglas Corporation v. Green, 411 U.S. 792 (1973); Price Waterhouse v. Hopkins,

490 U.S. 228 (1989).  As Plaintiff is not required at summary judgment to select which theory to

pursue, I will address both.  See Starceski v. Westinghouse Elec. Corp., 54 F.3d 1089, 1098 (3d

Cir. 1995).

*Prima Facie Case*

Although Plaintiff bases her pretext allegation on both federal and state statutes, they all

trigger the same Title VII analysis.  See Estate of Olivia, 604 F.3d 788, 798 (3d Cir. 2010); Moore

v. City of Philadelphia, 461 F.3d 331, 340-41 (3d Cir. 2006); Weston v. Pennsylvania, 254 F.3d

420, 431 (3d Cir. 2001); Darby v. Temple University, 246 F.Supp.3d 535, 543 (E.D. Pa. 2016).  In

a failure to promote case, a Title VII plaintiff must make out the following *prima facie* showing

of racial discrimination:

> (1) she is a member of a protected class;
> (2) she was qualified for the position she sought;
> (3) she suffered an adverse employment action; and
> (4) similarly situated persons who are not members of the protected class were treated more
> favorably.

Taylor v. Brandywine Sch. Dist., 202 Fed. App'x 570, 575 (3d Cir.2006); see also Jones v. School

Dist., 198 F.3d 403, 411 (3d Cir.1999) (in Title VII cases, the "familiar burden-shifting framework

the Supreme Court articulated in [McDonnell Douglas]" applies).

Once there is a *prima facie* showing, the employer must articulate some permissible reason for the adverse employment action.  See Krouse v. Am. Sterilizer Co., 126 F.3d 494, 500 (3d Cir.1997).  Their burden is:

> relatively light: it is satisfied if the [employer] articulates any legitimate reason for the [adverse employment action]; the [employer] need not prove that the articulated reason actually motivated the [action].

Id. (quoting Woodson v. Scott Paper, 109 F.3d 913, 920 n.2 (3d Cir.1997)).  If the employer makes this showing, the employee must then establish by an evidentiary preponderance that the stated reason was pretextual.  Id.

Although Defendants do not address the issue, Plaintiff has not made a *prima facie* showing.  Defendants never refused to promote Plaintiff to CFO; she never applied for the position.  As I have discussed, Plaintiff testified that she knew of the opening but declined to apply because it was not publicly posted.  Yet, she made no effort to determine how the position would be filled.  Jones and Bowen testified that they would have considered Plaintiff for the position, had she applied.  Moreover, Plaintiff had known for years about Hoefler's upcoming retirement.  As I have described, the CFO opening was common knowledge; City employees were encouraged by word of mouth to apply.  Indeed, Lowry applied for the CFO position through word of mouth.

Although Plaintiff is less than clear, she apparently contends that she suffered an adverse employment action when Jones and Bowen told her in November 2018 that she might not be appointed to the CFO position.  (See Pl. Opp'n Br. 6, 20.)  This alone was not an adverse employment action.  See Bates v. Tandy Corp., 186 Fed. Appx. 288, 293-94 (3d Cir. 2006) (citing Bray v. Marriott Hotels, 110 F.3d 986, 990 (3d Cir.1997)) (*prima facie* case for failure to promote claim requires application and rejection to establish adverse action).

In these circumstances, Plaintiff has not made out a *prima facie* case, thus dooming her discrimination claim. Although I could end my analysis of that claim here, in an abundance of caution, I will assume *arguendo* that she has made a *prima facie* showing, and continue under McDonnell Douglas. (Def's Mot. Summ. J. at 4-5.)

*Pretext*

Defendants offer a legitimate, non-discriminatory reason for not promoting Plaintiff: "her shortcomings as a manager," and "their concerns that Plaintiff did not possess the communication and interpersonal skills required to be CFO." (Def's Mot. Summ. J. at 4, 6.) In detailing the specific problems observed by Plaintiff's superiors, her inability to work with Ops/Fisc employees was just one. Plaintiff thus has the "difficult burden" of showing that the proffered reason is pretextual. She:

> must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence . . . .

Fuentes v. Perskie, 32 F.3d 759, 764-65 (3d Cir. 1994) (internal citations omitted).

Although Plaintiff argues that "the record literally abounds with evidence of pretext," the record shows the opposite: that the stated basis for not promoting Plaintiff—her professional shortcomings—was not pretextual. (Pl. Opp'n Brief at 4.) I have described that after she was last formally evaluated Plaintiff had significant difficulties managing her own staff. (See e.g., Jones Dep. 20:4-21:1.) Plaintiff also had difficulty working with employees of different departments. (McLintock Dep. Dep. 121:11-125:20; Bowen Dep. 65:9-66:5.) She ran meetings poorly. (Hoefler Dep. 35:4-13; 36:22-37-5; 69:19-24.) Her performance evaluations of other employees were problematic. (McLintock Dep. 119:18-120:24.) It was Plaintiff alone who believed that because the Ops/Fisc staff was mostly African American it received preferential treatment, that it

"wanted to fight about everything," and that it "gang[ed] up" on her more diverse Fiscal staff.  By her own description, Plaintiff was "very vocal" in expressing these opinions, thus creating a "palpable tension" within the Department.  Not surprisingly, Plaintiff's supervisors questioned her "interpersonal skills" and "lack of flexibility."

In her intemperate filings, Plaintiff never addresses the merits of these criticisms, other than dismissing them as mere "*advice* from upper management."  (Pl. SUMF ¶ 80.)  Rather, she emphasizes Hoefler's purported statement that Lowry was "the only African American they could get in for an interview."  (Pl. Opp'n Brief at 12.)  Yet, as I have described, Plaintiff did not view this purported statement as evidence that she was not promoted because she is Caucasian.  To the contrary, she acknowledged she had no such evidence.  (McLintock Dep. 142:3-7.)  Further, Hoefler, who is now retired, denies making the statement or that Plaintiff was passed over because of her race.  Indeed, it was Hoefler who had counseled Plaintiff repeatedly on her problems working with another supervisor—counseling that Plaintiff believed was "unfair[]."  (McLintock Dep. 119:18-120:24; 122:9-16.)  Moreover, assuming Hoefler's purported statement would be admissible at trial, because it was made by a "non-decisionmaker[]" it does not show pretext.  See Ezold v. Wolf, Block, Schorr & Solis–Cohen, 983 F.2d 509, 545 (3d Cir.1992) ("Stray remarks by non-decisionmakers … are rarely given great weight, particularly if they were made temporally remote from the date of decision.").  Although Hoefler was one of several people who interviewed CFO candidates, he was not a *decisionmaker*: Commissioner Jones *alone* was.  (Pl. SUMF ¶ 43.)

Plaintiff also premises her pretext allegations on the City's purported misuse of its diversity hiring program.  In support, she offers a November 2012 email Jones received from the City's Director of Diversity and Inclusion, Nolan Atkinson:  "I am writing to schedule our regular quarterly meeting to review the Office of DBHIDS workforce diversity metrics as of October 31,

15

2017.  I would also like to review your current hiring plans at the exempt level."  (Pl. Opp'n Br.

14-15.)  Plaintiff urges that Atkinson's "diversity metrics" are "a farce" by which the City was

imposing "actual quotas":

> Encouraging diversity is one thing, but using metrics and requiring that jobs be
> filled by black candidates, irrespective of credentials (and outside of any legal
> permissible affirmative action plan, which is not present here) is point blank illegal.

(Pl. Opp'n Brief at 10, 15.)

Plaintiff thus condemns virtually all diversity efforts as a pretext for racial discrimination.

Yet, the City's diversity policies (which Atkinson was trying to implement) cannot show pretext

because "[a]n employer has every right to be concerned with the diversity of its workforce, and

the work environment."  Iadimarco, 190 F.3d at 164.  Nor can Atkinson's statement that he would

review "diversity metrics" and "hiring plans at the exempt level" be construed as instructions to

discriminate against Caucasians or to discriminate against Plaintiff almost two years later (when

Lowry was appointed CFO).  See, e.g., Geier v. Medtronic, Inc., 99 F.3d 238, 242 (7th Cir. 1996)

("[t]o be probative of discrimination," supervisor comments must be "contemporaneous with the

[adverse employment action] or causally related to [it]").

Plaintiff next argues that she has made out pretext because Lowry was not qualified for the

CFO position.  Although Plaintiff again offer no evidence to support her opinion,  even if she is

correct, "the question is not whether the employer made the best, or even a sound, business

decision; it is whether the real reason is [discrimination]."  Willis v. UPMC Children's Hosp. of

Pittsburgh, 808 F.3d 638, 647 (3d Cir. 2015) (internal citations omitted).

Plaintiff contends that adding the CPA requirement for the CFO position is also evidence

of pretext—presumably because she is not a CPA.  Yet, as I have discussed, this criterion did not

cause Plaintiff to refrain from applying for the CFO position.  Moreover, the requirement was

16

added in 2019 *after* Plaintiff alleges the decision was made not to promote her (as described in her November 2018 meeting with Jones and Bowen).   In any event, although adding a pointless requirement might serve as a pretextual basis to eliminate a job candidate, requiring the Department's Chief Financial Officer to be an accountant was hardly pointless.   See, e.g., Dixon v. Pulaski County Special School Dist., 758 F.3d 862, 870-71 (8th Cir. 2009) (updating job qualifications is not evidence of pretext where the new qualification relates to the job's actual responsibilities) abrogated on other grounds by  Torgerson v. City of Rochester, 643 F.3d 1031 (8th Cir. 2011).   That is presumably why Hoefler, although not a CPA, was an experienced accountant; by her own testimony, Plaintiff never even studied accounting.

Similarly, there was nothing unusual or pretextual in DBHIDS's use of a nationwide search firm to find CFO candidates.   That is how Jones and Bowen had been recruited to DBHIDS—a process "very typical" for the Department.   (Jones Dep. 9:21-23, 81:16-18; Bowen Dep. 17:6-19:4.)   Although Plaintiff suggests that the City used a search firm to hide the opening from Plaintiff, this is absurd.   (Pl. ¶ SUMF 24-25.)   Plaintiff had known about the opening for years.   As I have discussed, the CFO opening was widely known; the Department sought by word of mouth to encourage applicants.   Indeed, that is how Lowry learned of the opening.

Again suggesting that the City regularly practices racism, Plaintiff points to other Caucasian plaintiffs who had accused the City of racially motivated employment decisions.   (Pl. Opp'n Brief at 23) (See Pierce v. City of Philadelphia, 811 Fed. App'x 142 (3d Cir. 2020) (affirming jury verdict that no discrimination occurred); Brennan v. City of Philadelphia, 2020 WL 3574454, at *1 (E.D. Pa. June 30, 2020) appeal filed (granting summary judgment for the City)). Pierce and Brennan have nothing to do with the instant case.   Neither matter involved DBHIDS staff or decisionmakers.   Once again, Plaintiff has failed to show pretext.

Finally, as I have discussed, it makes no sense that Jones would need a pretext—Plaintiff's inability to supervise or work with others—to conceal his racial motivation. If Jones failed to promote Plaintiff because she is Caucasian, he would not have (according to Plaintiff) first told her she was likely to get the CFO position.

In sum, because Plaintiff bases her pretext allegations on illogic, "speculation and conjecture," her discrimination claims cannot survive summary judgment. Acumed LLC v. Advanced Surgical Servs., Inc., 561 F.3d 199. 228 (3d Cir. 2009).

*Mixed-Motive Theory*

Here I must apply two distinct standards: one for the Title VII, PHRA, and PFPO claims, and another for the § 1981 claim. See Price Waterhouse, 490 U.S. at 228; Tomaszewski v. City of Philadelphia, 2020 WL 2512789, at *11 (E.D. Pa. May 15, 2020).

To make out a violation of Title VII, PHRA, and PFPO, Plaintiff must prove—using direct or circumstantial evidence—that race was a motivating factor in the City's failure to promote her. Desert Palace, Inc. v. Costa, 539 U.S. 90, 99 (2003). If this burden is met, then Defendants must show that they "would have taken the same action in the absence of the impermissible motivating factor." 42 U.S.C. § 2000e-5(g)(2)(B).

To prove that Defendants violated § 1981, Plaintiff must produce "direct evidence" that race was a motivating factor in the decision not to promote her. Anderson v. Wachovia Mortg. Corp., 621 F.3d 261, 267-68 (3d Cir. 2010). That evidence must be: (1) strong enough to permit a jury to find that a discriminatory attitude was more likely than not a motivating factor in the City's decision; and (2) connected to the City's decision, meaning that "any statements made ... must [have been] made at a time proximate to the challenged decision and by a person closely linked to that decision." Id. at 269 (citing Walden v. Georgia–Pacific Corp., 126 F.3d 506, 513–

16 (3d Cir. 1997)).  The direct evidence must demonstrate that a decisionmaker "placed substantial negative reliance on an illegitimate criterion" in reaching the decision.  Id.  These requirements create a "high hurdle" for plaintiffs. Walden, 126 F.3d at 513.

Plaintiff is unable to make out a claim under either standard.  First, as I have discussed, Plaintiff never applied for the CFO position.  In addition, for the reasons I have discussed, a reasonable jury could not find that race was a motivating factor in the decision to make Lowry, and not Plaintiff, CFO.  See supra IV.A.1; Hartwell v. Lifetime Doors, Inc., 2006 WL 381685, at *4 n. 6 (E.D. Pa. February 16, 2006) ("similar reasoning" governs the Title VII mixed-motive and pretext analyses); see also Burlington v. News Corp., 759 F. Supp. 2d 580, 601 (E.D. Pa. December 28, 2010) (it is "redundant" to rehash a plaintiff's evidence of pretext under the mixed motive analysis).  Defendants present uncontradicted evidence that Plaintiff's deficiencies as a manager and co-worker were the sole and legitimate reason she was not made CFO.  In contrast, Plaintiff's reliance on direct and circumstantial irrelevancies—such as the use of a recruiting firm—could not convince a reasonable factfinder that race played a role in the City's promotion decision.

Moreover, as I have discussed, Plaintiff's only "direct" evidence of discrimination is non-decisionmaker Hoefler's statement, which he denies making.  Plaintiff herself did not view this as direct evidence of discrimination, however.  (McLintock Dep. 142:3-7.) ("Q. Do you have any firsthand knowledge or do you remember any conversations with anyone that the department or Commissioner Jones was not seeking to hire you because you are Caucasian? [Plaintiff]: A. No.").  There is no evidence that Jones, the actual decisionmaker, considered Plaintiff's race in selecting Lowry.  The record thus does not support Plaintiff's § 1981 claim.  See Walden, 126 F.3d at 515 (rejecting reliance on evidence that does not "directly reflect[] retaliatory animus on the part of the decisionmakers").

In these circumstances, Plaintiff's allegation that Bowen and Jones orchestrated the *entire* CFO hiring process as "a rouse [sic] to avoid the appearance of impropriety" has no evidentiary support and makes no sense.  (Pl. SUMF ¶ 36.)

B.  Retaliation

Plaintiff charges under the PHRA, PFPO, First Amendment, Title VII, and § 1981 that: (1) the failure to promote her to CFO was itself retaliation for her complaints about racist behavior by the Ops/Fisc Unit in 2018; and that (2) she was subjected to a hostile work environment as retaliation for filing her first EEOC charge in 2019 and this lawsuit.

To make out a *prima facie* case of retaliation under the First Amendment and the statutes Plaintiff invokes, she must show that: (1) she engaged in protected activity; (2) Defendants took an adverse employment action against her during or after the protected activity; and (3) there was a causal link between the protected activity and the adverse employment action.  See Moore v. City of Phila., 461 F.3d 331, 340–41 (3d Cir. 2006); Thomas v. Independent Tp., 463 F.3d 285, 296 (3d Cir. 2006).  To make out the first element, the activity must be based on an "objectively reasonable belief, [held] in good faith" that the practice complained of is unlawful under Title VII. Id. at 341 (citing Clark County v. Breeden, 532 U.S. 268, 271 (2001)).  If Plaintiff lacked good grounds to believe that Title VII was being violated in the workplace, then her complaints do not receive the law's protection.

The second element—adverse action—requires that "a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 68 (2006) (internal citation and quotation marks omitted).  In evaluating the "material adversity" requirement, "it is important to separate

significant from trivial harms," because "[a]n employee's decision to report discriminatory behavior cannot immunize that employee from those petty slights or minor annoyances that often take place at work and that all employees experience." Id.

The third element—causation—concerns: "(1) the temporal proximity between the protected activity and the alleged discrimination and (2) the existence of a pattern of antagonism in the intervening period." Hussein v. UPMC Mercy Hosp., 466 F. App'x 108, 112 (3d Cir. 2012) (internal citations omitted). The record "as a whole" can also establish causation. Carvalho-Grevious v. Delaware State University, 851 F.3d 249, 260 (3d Cir. 2017). The causation test for First Amendment claims is almost identical. See Lauren W. v. DeFlaminis, 480 F.3d 259, 267 (3d Cir. 2007).

*Failure to Promote*

Plaintiff insists that "but for her having voiced concern of racially motivated conduct (being clearly condoned), she would not have jeopardized [Jones's] previously expressed intentions that she assume the CFO role." (Pl. Opp'n Brief at 20; Pl. SUMF ¶ 94, 97.) Plaintiff points to her 2018 meetings with Bowen, when Plaintiff protested the preferential treatment of Black Ops/Fisc staff, as well as two 2018 emails in which she requested cultural awareness training. (Id. at ¶ 97-98.) She connects these complaints to the November 2018 meeting with Jones and Bowen, during which she was informed that she might not be appointed CFO. (Pl. Opp'n Brief at 20.)

Plaintiff fails to make a *prima facie* showing. Once again, Defendants did not 'fail' to promote Plaintiff to CFO; she never applied for the position. See Bates, 186 Fed. Appx. at 293-94. Moreover, Plaintiff's complaints of "black favoritism" were not protected activity because she lacked objectively reasonable grounds to conclude that the law was being violated. (McLintock Dep. 72:21-73:20.) Plaintiff's belief that the Black Ops/Fisc staff received preferential treatment

because of race and engaged in "aggressive and insubordinate" racist conduct had no basis:
Plaintiff presents no evidence (other than her own conclusions) to support her ugly accusations.
There are thus no grounds to support a reasonable belief in illegal behavior.  See Moore v. City of
Phila., 461 F.3d 331, 340–41 (3d Cir. 2006); see also Gress v. Temple University Health System,
784 Fed. Appx. 100, 106 (3d Cir. 2019) (plaintiff must present "facts identifying specific behavior"
that violates Title VII; "conclusory statements" that discrimination was occurring are insufficient).

*Hostile Work Environment*

Plaintiff alleges that events after the filing of her first EEOC complaint (and this suit) make
out a retaliatory hostile work environment in violation of the PHRA, the PFPO, the First
Amendment, § 1981, and Title VII.  I will address the statutory claims first.

The elements of a statutory hostile work environment retaliation claim are "unsettled" in
this Circuit.  See Petrulio v. Teleflex Inc., No. 12-7187, 2014 WL 5697309, at *10 (E.D. Pa. Nov.
5, 2014).  More recently, the Circuit declined to decide whether "severe or pervasive" conduct or
"material adversity" is necessary.  See Komis v. Secretary of the United States Department of
Labor, 918 F.3d 289, 298-99 (3d Cir. 2019); see also id. at 299 n.9 (observing that five other
Circuits, including the Second, Seventh, and D.C. Circuits, require severe and pervasive conduct).
The elements question is academic here, however, because Plaintiff cannot show severe or
pervasive conduct, or material adversity.

The material adversity standard is meant to "separate significant from trivial harms."
Burlington Northern, 548 U.S. at 68 ("[a]n employee's decision to report discriminatory behavior
cannot immunize that employee from those petty slights or minor annoyances that often take place
at work and that all employees experience….").  Further, this standard "unquestionably leaves in
place a plaintiff's burden to show the allegedly hostile work environment was motivated by

retaliatory animus." <u>Komis</u>, 918 F.3d at 299.

Plaintiff has not made out material adversity.  Lowry's critique of Plaintiff's work and remark that she did not possess a CPA are exactly the kind of 'petty slights' that the <u>Burlington Northern</u> Court cautioned against.  <u>Cf.</u> <u>Brennan v. Norton</u>, 350 F.3d 399, 419 (3d Cir. 2003) (declining to find adverse action where the "alleged retaliatory acts were criticism, false accusations or verbal reprimands.")  The remaining incidents are similarly trivial and could not "dissuade a reasonable worker from making or supporting a charge of discrimination." <u>Burlington Northern</u>, 548 U.S. at 57.  Receiving a late meeting invitation, being left out of a meeting concerning one's work, and not being initially invited to meetings between one's superior and subordinates all sound as minor slights.  <u>Compare</u> <u>Martinelli v. Penn Millers Ins. Co.</u>, 269 Fed.Appx. 226, 230 (3d. Cir. 2008) (supervisor's "unpleasant and annoying" scrutiny was not materially adverse), <u>and</u> <u>Spangler v. City of Philadelphia</u>, 2012 WL 1835599 at *13 (E.D. Pa. May 21, 2012) (refusal of coworkers to assist or speak to plaintiff were mere petty slights), <u>with</u> <u>Davis v. Southeastern Pennsylvania Transportation Authority</u>, 2016 WL 97922 at *15 (E.D. Pa. January 8, 2016) (supervisor's threat to "bounce" plaintiff from unit if she did not "get along" with an employee against whom she had previously filed a complaint was materially adverse).

To be 'severe or pervasive,' the workplace must be "permeated with discriminatory intimidation, ridicule, and insult[ ] that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." <u>Komis</u>, 918 F.3d at 293 (internal citations omitted).  As I have discussed, of the six "retaliatory" incidents over six months, none involved intimidation, offensive speech, or threats.  This is not sufficient to show an 'abusive' work environment.

Moreover, Plaintiff has failed to establish that any of the actions by her superiors were

23

"motivated by retaliatory animus."  Komis, 918 F.3d at 299.  None involved reference to her EEOC charge or this lawsuit, let alone Plaintiff's race—the purported focus of the retaliatory animus. Further, Plaintiff has offered no evidence that other, similarly-situated Department employees were treated more favorably.  See Tucker v. Merck & Co., Inc., 131 Fed. App'x 852, 589 (3d Cir. 2005).

*First Amendment*

Plaintiff argues that her 2018 complaints to Bowen and Hoefler about the Ops/Fisc staff's 'racially-motivated behavior' were protected speech, for which she suffered unconstitutional retaliation.  Plaintiff similarly contends that she suffered unconstitutional retaliation for filing her 2019 EEOC charge and this lawsuit.  (Pl.'s Opp.'n to Summ. J. 25-27.)  Yet again, there is no record support.

The criticisms of the Ops/Fisc staff Plaintiff raised with Bowen and Hoefler were not protected speech.  The Supreme Court has held that "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." See Garcetti v. Ceballos, 547 U.S. 410, 421 (2006).  Plaintiff was supervised by Bowen and Hoefler.  Reporting to them her conclusion that subordinate employees she observed as Fiscal Director were acting illegally would clearly be within her official duties.  See Morris v. Philadelphia Housing Authority, 487 Fed.Appx. 37, 39 (3d Cir. 2012) ("We have consistently held that complaints up the chain of command about issues related to an employee's workplace duties— for example, . . . misconduct by other employees—are within an employee's official duties.") (citations omitted).

Moreover, assuming *arguendo* that Plaintiff's 2019 EEOC filing is protected activity,

24

because she did not suffer sufficiently adverse employer response to the EEOC filing (or to this lawsuit), she cannot make out retaliation.  But see Connick v. Myers, 461 U.S. 138, 147–48 (1983); Borough of Duryea, Pa. v. Guarnieri, 564 U.S. 379, 386-89 (2011); Bell v. City of Philadelphia, 275 Fed.Appx. 157, 158 (3d Cir. 2008) (administrative filings raising purely personal concerns are not covered by the First Amendment right to petition).  Even to plead a viable First Amendment retaliation claim, "a plaintiff must allege . . . retaliatory action sufficient to deter a person of ordinary firmness from exercising her constitutional rights . . . ." Thomas, 463 F.3d at 296;  see also Suppan v. Dadonna, 203 F.3d 228, 235 (3d Cir. 2000) (citing Bart v. Telford, 677 F.2d 622 (7th Cir. 1982)) ("Section 1983 is a tort statute. A tort to be actionable requires injury. It would trivialize the First Amendment to hold that harassment for exercising the right of free speech was always actionable no matter how unlikely to deter a person of ordinary firmness from that exercise . . . ."); Crawford–El v. Britton, 523 U.S. 574, 589 n. 10 (1998) ("The reason why such retaliation offends the Constitution is that it threatens to inhibit exercise of the protected right.").  Plaintiff's description of the retaliation she 'suffered' at the hands of her superiors does not meet this deterrence standard.  She does not allege any retaliatory actions in the context of her First Amendment claim that were not discussed under the heading of her Title VII arguments, and—as I have discussed at length—none of these alleged harms was more than *de minimis*.  (See Pl. Opp'n Brief at 25-27.)

Accordingly, Plaintiff has not made out a viable First Amendment retaliation claim.

## VI.   CONCLUSION

The record shows that Plaintiff is a poor manager and a less than ideal co-worker.  It also appears that, beginning in August 2017, Plaintiff became consumed with the Department's racial makeup, convinced that its Black employees acted inappropriately and, under the guise of

promoting diversity, were treated more favorably than others.  Yet, she has produced no evidence to support these accusations.  Finally, it appears that Plaintiff understood that her CFO candidacy might be problematic and so did not apply for the post, opting instead to conjure this baseless lawsuit.  In these circumstances, Defendants acted well within the law when they declined to promote Plaintiff to CFO.

I will grant Defendants' Motion for Summary Judgment as to all Counts.

An appropriate Order follows.


*/s/ Paul S. Diamond*
_____

December 3, 2020                                   Paul S. Diamond, J.

26